We're going to begin with United States v. Horn. Mr. Hersey. Good morning. Good morning. My name is Michael Hersey and I'm here for Appellant Horn. What I'd like to do with the court's permission is look at a couple of the sentencing issues first. But I'd ask that you read, as you already have, look at the sufficiency of the evidence argument that I raised in argument number one. But because of the limited time we have, I'd like to address some of the sentencing issues. First is what I labeled argument two, and that was whether Mr. Horn was an organizer or a leader. He got a four-level enhancement for that, and I'm asking the court to remand for a resentencing. Money defines relationships. If you look at the money distribution here, it will define who the organizer's leaders are and who the lackeys are, my client. Mr. Watson Sr. and Watson Jr., who I think the government and defense both agree, were the leaders and organizers of this group. So let me make sure I understand this stuff. Mr. Horn hired the salesman, right, including Plummer? Well, he was head of what they call a call center. It's two or three people. Mr. Plummer was a sales agent. He hired him. Mr. Horn hired them, right? He selected them. That's right. And paid their commissions. Well, the money didn't come from him. The money came from above. It came from funds transferred directly into an account under his. That's correct. Right? And he and the others agreed that he would receive 22.5% of the proceeds from the stock sale, right? Yes, Judge, but that boiled down to about $25,000 in the 19 months he was there. It more or less boils down to about $8.50 an hour, which is minimum wage. And when you compare that, Chief Judge Pryor, to what Bird, Watson Sr. and Jr. got, they got over a million dollars of the $1.5 million that was generated by sales of the share. Royce Teets, an unindicted co-conspirator, got $450,000. My client got $25,000. So I would suggest to the court that if you look at that alone, follow the money trail, that defines relationships and shows my guy was not an organizer or a leader. And also keep in mind, too, that immediately before this job, he was working at a sprinkler repair company and was living with his parents. So I think you see the problem I think that you have here, Mr. Hersey, is that we're reviewing this for clear error. And Chief Judge Pryor cited some of the evidence that came in. What you've got to establish here is that the judge was not only wrong factually, but really, really wrong. Where's the clear error in the determination given that he was entitled to a larger share of the profit? He hired a bunch of the salespeople. He ran and set up four centers to do this. Why would the determination be clear error? Even if we might disagree as a fact finder, where's the clear error in this judge's determination? Judge Marcus, I'd ask that you use the de novo review standard and that I argue all these below at the objections to the PSI at sentencing and at the restitution hearing. Well, is there anything that would suggest that the district court misunderstood the law, the guideline, as opposed to its factual determinations? Because it seems to me that this inquiry is about the facts and that we would review for clear error. But if you want us to review this only de novo, then you've got to explain, I think, how the district court somehow misunderstood the law as applied to those facts. Yes, Judge, I put that in the brief and that organizer leader is the top of the hierarchy here. Now, I cited a couple of cases there and drug cases where there were so-called middlemen or people that orchestrated drug sales between a source and a buyer. And I would suggest that our facts here are akin to that. He is in the middle. He's not. You can take all the facts found by the district court. And you accept them. You're not suggesting that any of those facts are clearly erroneous. And we're only to look at the legal determination here. Is that is that you're right? Yes. That's a good summary of it, because the facts that you stated are in the record. And I think one thing that the judge below did do, though, my client would often carry out orders from Bert Watson, Jr., who was at the top. And I think that the judge confused the authority that my guy had with that of Mr. Watson, Jr. But the loss that what we're supposed to be looking at in terms of the governing law is exercise of decision making authority. Nature of participation in the commission of the offense, recruitment of accomplices, claimed right to a larger share of the fruits of the crime, degree of participation in planning and organizing. I mean, the degree of control and authority exercise that were the others, all these factors. When you consider the facts that I was outlining earlier, it seems to me the district court understood what the law was. OK, and I would politely disagree because the organizer leader role is one that manages and supervises people. Right. My client and these people he recruited to do this work. But that was very menial. I would make that akin to if you have like Shell Oil Company of executives that make the decisions like we're going to issue this number of shares, how much they are. Then you have a gas station manager. Yes, that gas station manager employs people. Hey, Fred, you better be here on Friday because you're taking the Steve shift. But to equate that gas station manager with an organizer leader like the executives at Shell, I think would be a mistake, even though those have. But you can have. A middle manager, depending on the facts, be an organizer leader, can you not? You can judge, but you raise a good point. If I had to concede a point here, my client is more like a manager for a two level increase as opposed to an organizer leader for the four levels. So that that's the fallback position. If the court were to think that what he did basically in carrying out the orders given to him, he was more akin to a manager for two, two and a half minutes. He said you had a second sentencing issue. Yes, yes. Whether he the intended loss and actual loss issues of the district court below, I did not do the individualized specific tailoring of the facts to my client as. As I ask you, let me ask you a preliminary question in that regard, did you raise that issue in the district court? Yes, I argued intended loss versus. Right. Did you make the particular argument that you're making now? The kisser to be argument, or did you argue intended loss for a different reason? Well, just I would suggest that I argued both of them. And here's why I say that. And the arguments in my PSR objections and in the actual argument I made and in the written comments, I argued that he did not make particularized findings. I did not make individualized findings on my client on a variety of these things, such as yes, it seemed to me, though, to go back to Judge Marcus's point that you raised an issue. About ambiguity and the guideline definition that the commission would not be able to resolve through commentary that that does not appear to me to be what your argument was in the district court, which is a Dupree argument. Yes. Well, the argument I presented to you now in written form is certainly more polished than what I did with the district court. There's a difference, though, between polishing an argument and presenting a completely different one. OK, well, I would suggest that with the elements that I argued, Judge Marcus, the method that was used to. Reach those numbers into the loss and actual loss and that's specified findings that the court did not do that below. And with that, I would ask the court to examine those and also look at the sufficiency of the evidence arguments. Let me just follow up for a moment on this issue. We have a case out there, Verdeza, that we decided in 2023. And in that case, we observed that Verdeza did not preserve the precise question here, whether to be one point one's definition of loss is ambiguous and thus requires resort to the guidelines, commentary, etc., etc. We consider that question to plain error review. Do we have to consider your argument for plain error? The reason I raised that is if we do. I don't think there's anything from the Supreme Court or our court precisely on point, in which in which case, by definition, it could not be plain error. Yes, and I cited Verdeza in the brief, and when you compare what I did in preserving the issues as opposed to what Verdeza attorney did in preserving his issues, I did more than that. So I would suggest that I surpassed that level. Thank you. Thank you. Thank you, Ms. Perwin. Good morning, your honors. May it please the court. Amanda Perwin on behalf of the United States and with me is Dwayne Williams, who tried the case below. I'll start with Roel. As the court observed a number of factors control the district court's decision, although not all of them have to be met. Here, many of them were and I think as the court has observed. Number one, Mr. Horne claimed a larger share of the proceeds. He and one other codefendant, Mr. Tietz, were entitled to 22.5% of each investor's proceeds. And that's in government exhibit 5.1 and 5.2. So there's really no dispute about that. It's also undisputed that he opened the offices. So that's a large degree of planning and organizing, particularly in a boiler room case where all of the activities happening in the boiler room. He hires recruits the salespeople, including Plummer, and he not only that he pays them and he pays them out of his own 22.5%, right, which is something that a supervisor does. It's not something a payroll manager or an HR person does. So so I would say, Your Honor, this case is closer to the Rendon case. I would analogize Mr. Horne to the boat captain. He's not the kingpin. He's not the Watsons. There's no dispute about that. But he's the boat captain. He's running the boat and he's controlling the crew. He's supervising the crew. He's paying them, you know, whatever the case may be. So I don't think this is particularly close. I think there's no clear error below. I think the court, the district court, applied the law to the facts appropriately. As far as loss, Judge Marcus, I think you said it better than I could. Verdeza controls. This issue was not raised below at most. Well, I want to just stop you and ask you about that. He certainly raised the issue of actual versus intended loss. What it seems to me he did not do is make the precise argument in the district court that he's making here. So he raised the issue and said you should use actual not intended loss for a different reason, didn't he? Exactly, Your Honor. It would be more fair. It's a better measure. So let me follow up and ask the question this way. We've got a whole bunch of case law out there that basically says. If you raise an issue. Squarely and you assert argument one. But you don't assert arguments two and three, and there are really three arguments you could make. And then you come back later. Raising the same issue in an appellate court. Can't you raise an additional argument in support of an issue that you cleanly raised? Yes, Your Honor, but I would argue that's not what happened here. OK, tell me the difference between what I'm talking about and what you have here. Your Honor, what what Mr. Horn raised here and I'm at docket entry 182, as he said, the actual investors and actual sale more accurately reflects the loss. What he doesn't say is that this court has to disregard the commentary and to be one point one, because the word loss is not ambiguous under Kaiser, under Dupree. And therefore, as a matter of law, Judge, you've got to apply actual loss. The reason I raise it is when I looked at the record. Horn objected that, quote. The actual I'm reading now from his argument, the actual number of 68 investors, an actual sale of one million nine hundred and eighty five thousand shares. More accurately reflects the loss than the intended loss of three million seven hundred and fifty thousand. So he said, look at actual loss, not intended loss. And here's why he did not say because of Kisser, Dupree, ambiguity or any of that stuff. But I'm simply asking, having squarely raised the issue. Why can't he make this argument now conceding that he plainly did not make this argument in the district court? I think he can, Your Honor, but I think the court's review would still be for plain error because, quote, passing reference to an issue is not enough to meaningfully raise it below. The government didn't brief it. The district court didn't rule on it. I thought your argument was a moment ago. It was that this is an even passing reference that insofar as what he's now arguing is that intended loss. It's just an illegitimate consideration as a matter of law. He didn't make any argument like that at all. I think that is a better argument, but I think, Your Honor, at most what we would have here is a passing reference. But you're right. The argument he's making now is a legal argument that he, I think we all agree, did not make below. There's no mention of Kaiser. There's no mention of Dupree. Does Verdeza control in any event? In Verdeza, the argument of ambiguity was not raised. We said, therefore, we only review it for plain error. Yes, exactly, Your Honor. Is that even an open question for us? But I'm asking because it struck me, looking at it again, that he preserved the issue, even if he didn't raise the argument. Your Honor, my take on it, and of course, reasonable minds can disagree. My take on it is that this does not raise that issue. Maybe the answer is that if he had raised an argument of any kind that intended laws could not be used, then according to what Judge Marcus said, he's able to raise a different theory in support of that argument here. But that flat out proposition was not made below. Exactly, Your Honor. That, in my view, is a legal argument, right? That the district court was prohibited from considering intended loss as a matter of law full stop because the word loss is unambiguous, and therefore, we're in a world of actual loss. Can I ask you to turn to the loss issue for a moment? And I know that we review the intended loss determination for clear error, but there are a number of factual attacks that Mr. Hersey makes on Mr. Horn's behalf, and I'd like you to just comment on them. He says, number one, that relying on the sample of a small number of investors, I think four there were, is too small given the number of investors here to constitute a valid sample. He says that there was a process for selling the restricted shares. He says that the district court made a mistake in relying on what he calls a buyer's only theory. And he says that there were issues with regards to the foreseeability determination if there was one. Those are taken in a bucket, of course, but if you could respond as you see fit. Sure, Your Honor, and I'll take foreseeability first because I think that's a little bit of a different issue than calculating actual loss for restitution purposes. I'm not at restitution. I'm at intended loss under the guidelines. Okay, so if we're dealing only with intended loss, Your Honor, that number comes from the PPM, of which there are a number of versions. And the PPM tells investors, we intend to raise somewhere between $3.4 and $3.7 million based on these 300 million shares. So there's no need for any reliance. The government doesn't have to prove reliance until the restitution phase. The intended loss is simply, what did these people try to steal? But, I mean, maybe I just misread or maybe I was reading a different sentencing transcript. But the arguments below, the government's position below, as I recall, was not simply, look at the PPM, you've got intended loss, stop. The government went further, did it not? The government went further at restitution, Your Honor, when it was talking about actual loss. When we were sentencing, it happened under the guidelines. And that number, that 3.7 number, did come from the PPM. And the PPM was very specific. I mean, it didn't only announce what the scheme intended to raise, it announced what the company purportedly intended to do with that money. We're going to use it for M&A, we're going to use it for legal. And so that was the measure that the district court used. Right, and Mr. Hersey challenges restitution separately, arguing in part that actual loss could not be determined on what he calls a buyer's only theory. But as to intended loss under the guidelines, he raises all the issues I mentioned to you. You're telling me that they're all irrelevant. In my view, they're all irrelevant, because the intended loss under the scheme is simply, we're going to set up this boiler room, we're going to make up a bunch of lies about this company, and we're going to hire salespeople to dupe investors into investing. And what we plan to do is raise between $3.4 and $3.7 million. But okay, let's say you have a PPM like this in a boiler room. And the PPM says we intend to raise $1 billion by reaching out to 500,000 investors, okay, over the course of a year. But things go wrong for the bad guys. And they only reach out to 50 investors. Is intended loss still $1 billion? I think the government would have a decent argument, Your Honor, that it was. I understand a district court might not adopt that number because it's so much larger. But I think the point here is that I understand it's kind of an arbitrary pie-in-the-sky number, but it's a major part of the scheme. This is our plan, 300 million shares at varying prices to raise this amount of money to do these things. So it's very closely tied into the scheme. And it's not as if it sort of comes out of the sky and has nothing to do with the scheme in the case. So to me, it's a reasonable measure of intended loss because they announce over and over again, this is what we're raising based on this number of shares to do this work. I want to go back to this last thing and really the legal question. I want you to assume from my question that we're reviewing it not for plain error, but on the merits directly. Is the guideline here ambiguous or unambiguous in your view? I'm not talking about the commentary. I'm talking about 2B1.1. It speaks of, it says if the loss, 2B1.1 says, among other things, if the loss exceeded 6,500, increase the offense level as follows. Then there's a chart and one of the columns is headed by the words loss apply the greatest. It doesn't define the term loss itself. But is the guideline ambiguous anyway? Your Honor, I would argue, and I think the government's position consistently has been that, yes, the term loss is ambiguous. And the reason is that there's a number of ways it could be measured. You know, if you if you think about it in terms of accounting, I say ambiguous. I mean, as to whether it's actual or intended or just factual. Right. Yes, Your Honor. But I think that the word loss is ambiguous because it can be measured in different ways. Right. Which is what then kicks us into the commentary. To get to clarify. Right. But I want to hold the commentary aside for a moment. We look at the different parts of a statute and try and read them together as a whole. So if you looked at 1B1.3, which is kind of an introductory guideline that provides definitions for relevant conduct throughout the guidelines, it says that, quote, the court shall, for the purposes of calculations in Chapter two, unless otherwise specified, calculate harm as including, quote, all harm that resulted from the acts and omissions specified in subsections A1 and A2 above and all harm that was the object of such acts and omissions. What do we mean by object? Of the acts and omissions, doesn't that look prospectively, doesn't that suggest something more than actual? Absolutely, Your Honor. It sounds a lot like intended loss. It sounds that way to me. And so that's why I'm just asking, do we even have to look at the commentary to reach the conclusion? You take the position that the word is ambiguous, but I'm suggesting perhaps that it isn't ambiguous if you read it in pari materia with these other provisions. Certainly, 1B1.3 is a preface to what we're talking about here, right? Absolutely, Your Honor. And it certainly suggests not just in a loss context, but that intended harm generally is appropriate and district judges can take it into account under the guidelines. Absolutely. But again, in my view, this is a plain error case over desert controls and the court wouldn't even have to reach that decision. Thank you. Thank you, Your Honor. Thank you, Ms. Berwin. Mr. Hersey, you've saved five minutes. Judge Jordan, I'd like to pick up on a couple of thoughts that you made because when looking at the court below's determination, it used the buyer's only theory. And that's a very simple, but it assumes that every share was fraudulent and that every that there's no value to the shares. He did not go into the individualized findings. But Ms. Berwin, Ms. Berwin suggests that that had much more to do with restitution than it did with intended loss under the guidelines. I'm sorry. Is she wrong? Yes, she is, because he used that on both intended loss and determining the 3.75 million and in restitution. So that does not make the individualized findings. Remember, I'm not here to defend everything Sunset did. I'm just talking about what my client did and what he saw. And there were other factors, like, for example, his father bought shares and made a 60 percent profit. Can't you just simply disregard that as an insider purchase? And, you know, first in line, first in, first out, get my money, get out. And then everybody else suffers the consequences of the boiler room scheme. Judge, it wasn't only him, though. CEO Speck, chief of Sunset, also made money by selling his shares. And remember one thing that one of you that's the Sunset merge with Apex. That's correct. That's another person who's at least tangentially involved. I mean, it seems to me that district court conducting a factual inquiry could very well discount those individuals who were able to sell back their restricted shares and make some money off of this. Think that the whole thing otherwise was just a scam. But just one thing you should keep in mind, though, is that virtually none of the Sunset shareholders went through the process to get their shares unrestricted so they could sell them. And they admitted that some of them, even when they testified, said, yes, I still have the stock. I have not taken the steps to even try to sell it. Well, I didn't have to. They invested based on a belief of what this was going to be about and what they were investing in. Nothing required them to sell. Absolutely not. But it goes to the idea of whether the shares had value and any value of the shares would have to be subtracted from just the buyers only method. We just take the number of shares sold and how much the buyers pay. So maybe for restitution, but it doesn't seem to me that if you're using intended loss as the yardstick, I don't know why you would subtract net value from the equation. If you're using actual loss, yes, of course. Intended loss. I'm not sure. It seemed to me that all your arguments really went to the actual loss determination, which was relevant only to restitution. Not to the intended loss determination separate under the guidelines. And I agree with that. And also with that, I would say that my client was not there in the preparation or the creation of Sunset to determine the amount of shares. He was not participating in the PPM or the must read for Sunset advisors. I mean, investors, which were two of the and also the subscription agreement, the three critical documents that were given to a potential shareholder. So he had no participation, no involvement in those. And he, as a matter of fact, believed what was going on there and believed in the company. That's why he put so much effort into it. And then at the end, when he resigned, there was a flurry of emails between he and Bert Watson, Jr. Where my guy said, hey, you said we're going to go on NASDAQ. We're going to merge these other companies. You're telling me, asking me to tell potential buyers that I'm not seeing that. So I don't feel comfortable in relaying that to these potential buyers. And he withdrew in November 16th of 2015 based on that. So I would ask that you look at those factors and also, again, look at the arguments on whether or not from what he saw that he because there were other individuals like the CEO, the CFO, the COO of Sunset that worked there and said, hey, we were there and we didn't see any fraud at all. And also the independent stock transfer agent who also said I was there and I didn't see any fraud either. And there were some gemstones that were appraised that were by third parties. And Mr. Horne saw those and also believe that. So with that, I'd ask that you remand for resentencing and I'd ask that you respectfully look at the sufficiency of the evidence. Thank you. Thank you, Mr. Hersey. We have your case.